1

2

3

4                    UNITED STATES DISTRICT COURT

5                 NORTHERN DISTRICT OF CALIFORNIA

6

7    BARON APP, INC. D/B/A/ CAMEO,          Case No.  25-cv-09268-EKL

         Plaintiff,
8
                                           ORDER GRANTING MOTION FOR
9        v.                                PRELIMINARY INJUNCTION

10   OPENAI, INC., et al.,                 Re: Dkt. Nos. 43, 46, 50, 51, 58

         Defendants.
11

12

13        This trademark infringement action arises out of OpenAI's use of Plaintiff's federally-

14   registered CAMEO® trademark in connection with its newly released Sora 2 application.[1]  On

15   November 21, 2025, the Court issued a temporary restraining order ("TRO"), enjoining OpenAI

16   from using the CAMEO® mark in connection with its Sora application in the United States, and

17   ordered OpenAI to show cause why a preliminary injunction should not issue.  ECF Nos. 42, 43.

18   On December 19, 2025, the Court heard argument on the order to show cause.  ECF No. 59.  For

19   the following reasons, the Court GRANTS Plaintiff's motion for a preliminary injunction.[2]

20   I.      BACKGROUND

21        A.      Factual Background

22             1.      Plaintiff's Cameo Service

23        Plaintiff Baron App, Inc. d/b/a Cameo offers a "digital marketplace that connects fans with

24   celebrities through personalized videos."  Compl. ¶ 1, ECF No. 1.  Plaintiff has offered this service

25   _____

26   [1] Defendants in this action are OpenAI, Inc., OpenAI Global, LLC, OPENAI, LLC, OpenAI
     OpCo, LLC, and OpenAI GP, LLC (collectively, "OpenAI").

27   [2] For purposes of this Order, the Court refers to OpenAI's use of "cameo" prior to the Court's
     issuance of the TRO.  OpenAI has renamed this feature in compliance with the Court's order.  *See*
28   Pl.'s Reply in Supp. of Prelim. Inj. at 8, ECF No. 51 ("MPI Reply").

United States District Court
Northern District of California

since 2017, with a mission to "create the most personalized and authentic fan experiences on Earth." *Id.* ¶¶ 1, 28. Users access the Cameo marketplace through its website or mobile application, where they can request a personalized video from Cameo's "extensive catalog of talent, which includes thousands of well-known personalities from film, television, music, sports, and social media." *Id.* ¶¶ 26-27. Users then provide specific instructions or details to be included in the recorded video. *Id.* ¶ 27. For example, "a user can request that the celebrity wish a friend a happy birthday, deliver a marriage proposal, apologize on their behalf, answer a question, conduct a tarot reading, roast a loved one, or read from a prepared script." *Id.* Once the request is submitted, the celebrity records the personalized video and the user receives a notification when the video is available. *Id.* ¶ 28. The resulting videos are referred to as "Cameos" or "Cameo Videos" and are "usually vertically formatted for seamless viewing on mobile devices and sharing on social media." *Id.* Plaintiff's Cameos often go "viral," spreading widely across social media, including on TikTok, Instagram, and X.com (f.k.a. Twitter). *Id.*

Indeed, viral content is central to Cameo's business strategy. As Cameo co-founder Steven Galanis puts it, "[o]ne unique thing about Cameo's business model is that supply begets demand." Galanis TRO Reply Decl. ¶ 5, ECF No. 33. Thus, "[Cameo's] business has traditionally been driven primarily via talent promotion on social media, media coverage, and customer sharing of Cameo videos." *Id.* Galanis explains that many of the creators on the Cameo marketplace are "famous in their own right or have tremendously loyal followings," meaning that posting a Cameo Video on their social media account can turn their followers into Cameo customers. *Id.* ("I [Galanis] like to say that 'every Cameo is a commercial for the next one.'").

Plaintiff further alleges that "Cameo" has become a "beloved and widely recognized brand" known for its authentic, talent-friendly service. Compl. ¶ 2; *see also* Galanis TRO Reply Decl. ¶¶ 10-12. "Cameo's social media accounts have millions of followers," its video service has been featured in "thousands of media articles and reports," and "Cameo is frequently mentioned on TV shows like Saturday Night Live, The Tonight Show, and The Daily Show." Compl. ¶ 2. In 2019, Plaintiff launched "Cameo for Business," which allows companies to create custom ads featuring celebrities on Cameo. *Id.* ¶ 4. In 2022, Plaintiff launched "Cameo Kids," allowing

1   customers to gift personalized, artificial intelligence ("AI") generated videos from "beloved

2   animated children's characters."  *Id.* ¶ 5.  "To protect its valuable rights in its CAMEO®

3   trademark," Cameo has secured several U.S. Trademark Registrations, including U.S. Trademark

4   Reg. Nos. 6,113,018, 6,369,961, 6,026,358, and 6,026,359.  *Id.* ¶¶ 34-35; *see also* Byron TRO

5   Decl. Ex. 1, ECF No. 18.

6               **2.     OpenAI's Use of "Cameo"[3]**

7         On September 30, 2025, OpenAI announced Sora 2, an updated version of its Sora

8   application, which allows users to create AI-generated videos from a prompt.[4]  Compl. ¶ 7.  This

9   updated version of Sora includes a new feature that "allows users to create a virtual likeness of

10  themselves," which can be used by anyone on Sora to create "realistic, personalized AI-generated

11  videos."  *Id.*; *see also* Defs.' Opp. to TRO at 10, ECF No. 30 ("TRO Opp.").  OpenAI selected the

12  name "Cameo" for this new feature, and it refers to the resulting videos as "cameos."  *See* Compl.

13  ¶¶ 8, 10; *see also* Defs.' Opp. to Mot. for Prelim. Inj. at 9, ECF No. 50 ("MPI Opp.") ("OpenAI's

14  use of 'cameo' . . . describes something consumers can make using Sora.").[5]  OpenAI touted the

15  "cameo" feature as "unique to Sora 2," and promoted it as Sora's defining feature.[6]  *See* Raphael

16  TRO Reply Decl. ¶ 5, ECF No. 32 ("[T]here's one feature above all else that we're really pumped

17  about.  It's a new feature called Cameo and it's unique to Sora 2."); Sahai TRO Decl. Ex. A at 6,

18  ECF No. 30-17 ("We think a social app built around this 'cameos' feature is the best way to

19  experience the magic of Sora 2.").  As of now, the Sora application and its "cameo" feature are

20  free to use, but Sora Head, Bill Peebles, has indicated plans to "monetize" Sora by giving

---

[3] The following OpenAI employees are referenced in this Order:  Sora Head, Bill Peebles; Product Lead for Sora, Rohan Sahai; and a Sora researcher, Gabriel Peters.  *See* Sahai TRO Decl. ¶¶ 1, 15, ECF No. 30-16; Byron MPI Decl. ¶ 28, ECF No. 53 (describing Peters as identifying himself on X as "sora research at @OpenAI).

[4] Although Sora 2 was "invite only" at the time of its announcement, this limitation was removed a month later, on October 29, 2025.  *See* Compl. ¶ 40; Byron TRO Decl. ¶ 27.

[5] OpenAI also uses "cameo" to refer to the AI-likeness used to create the videos.  *See* Byron MPI Decl. Ex. 30 at 8 (stating that you can restrict the type of content created "with your cameo," *i.e.*, with your likeness).

[6] OpenAI refers to the revamped Sora application as "Sora" and "Sora 2" interchangeably.  *Compare* Byron MPI Decl. Ex. 4, *with id.* Ex. 5.

United States District Court
Northern District of California

"rightsholders . . . the option to charge extra for cameos of beloved characters and people."
Raphael TRO Reply Decl. Ex. 3 at 1.

Plaintiff alleges that OpenAI has adopted Plaintiff's unique marketing strategy by
"tapp[ing] several high-profile celebrities" to promote Sora and the new "cameo" feature.  Compl.
¶ 7; *see also* Pl.'s Reply in Supp. of TRO Appl. at 8, ECF No. 31 ("TRO Reply"); Sahai TRO
Decl. ¶ 25 ("OpenAI has not done any paid marketing for the Sora App.").  For example,
celebrities including Jake Paul, Mark Cuban, Ricky Berwick, and Snoop Dogg have joined Sora
and "opened their cameos," allowing users to generate "hyperreal," AI-generated videos featuring
these celebrities.  Sahai TRO Decl. ¶ 20; Compl. ¶ 51 (Jake Paul, Mark Cuban, and Ricky Berwick
on Sora); MPI Reply at 2 (Snoop Dogg on Sora).  These celebrities, and OpenAI employees,
promote Sora and the "cameo" feature on social media.  *See* Compl. ¶¶ 42 (showing Mark
Cuban's post on X stating that his "Cameos" on Sora are open has been viewed over 500,000
times), 43 (stating Jake Paul's "cameo" on Sora has "generated 1B+ views" in six days); Raphael
TRO Reply Decl. Ex. 3 at 9-10 (Sora Head sharing Jake Paul and Mark Cuban posts).  Many of
the celebrities now promoting Sora's "cameo" feature are also popular "talent" on Plaintiff's
Cameo marketplace.  *See* Scandinaro MPI Decl. ¶¶ 7-8, ECF No. 52 (showing that the most
"cameoed" users on Sora's "Leaderboard" are also talent on Cameo's marketplace, including Jake
Paul, Steak, Ricky Berwick, Caylus, and KreekCraft).  Consequently, some of OpenAI's videos
are virtually indistinguishable from Plaintiff's Cameo Videos.  Order Granting TRO at 8-9, ECF
No. 42 ("TRO Order"); *see also* App. Figure 1.[7]

### B.    Procedural History

On October 28, 2025, Plaintiff filed this action against OpenAI, asserting various federal
and state law claims for trademark infringement and dilution, as well as claims for unfair
competition.  ECF No. 1.  Two days later, Plaintiff filed an application for a TRO.  Ex Parte Appl.
for TRO, ECF No. 16.  Pursuant to the parties' stipulation, briefing on the TRO closed on
November 10, 2025.  ECF No. 29.  The Court heard argument on November 14, 2025, ECF

---

[7] Relevant images are included as Figures 1 to 4 in the Appendix to this Order.

United States District Court
Northern District of California

No. 36, and issued a TRO on November 21, 2025, ECF No. 43.  The Court also issued an order to show cause why a preliminary injunction should not issue, and set a briefing schedule.  *Id.*  On December 19, 2025, the Court heard argument, and pursuant to the parties' stipulation, extended the TRO until February 5, 2025.  ECF Nos. 59-60.  On February 4, 2026, on its own motion, the Court extended the TRO, finding good cause, until February 15, 2025.  ECF No. 69.

## II.     LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  *Id.* (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20.

Under the Ninth Circuit's "sliding scale approach," a preliminary injunction may issue where "serious questions going to the merits were raised and the balance of hardships tips sharply in [the movant's] favor."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  To raise serious questions, the movant's claim must be more than just "plausible."  *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 863 (9th Cir. 2022).  Rather, the movant must show that it has a "fair chance of success on the merits."  *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1192 (9th Cir. 2024) (quoting *Republic of the Philippines v. Marcos*, 862 F.3d 1355, 1362 (9th Cir. 1988) (en banc)).  Under the sliding scale approach, the movant still must show "a likelihood of irreparable injury and that the injunction is in the public interest."  *Cottrell*, 632 F.3d at 1135.

## III.    DISCUSSION

Plaintiff seeks to enjoin OpenAI from using the term "cameo" in connection with a feature on its newly revamped Sora application.  In evaluating whether Plaintiff has met its burden to obtain such relief, the Court first addresses the *Winter* elements, beginning with whether Plaintiff

United States District Court
Northern District of California

5

is likely to succeed on its trademark infringement claim.  The analysis initially focuses on the likelihood of confusion under the *Sleekcraft* factors, then turns to OpenAI's fair use defense. Finding that Plaintiff is likely to succeed on the merits, the Court addresses the remaining *Winter* elements – irreparable harm, the balance of the equities, and the public interest.  Finally, the Court addresses the appropriate bond under Federal Rule of Civil Procedure 65(c).

### A.    Likelihood of Success on the Merits

To prevail on a trademark infringement claim under the Lanham Act, Plaintiff must establish three elements:  (1) Plaintiff has a protectable ownership interest in the mark; (2) OpenAI used the mark in connection with goods or services; and (3) OpenAI's use is likely to cause confusion.  *LegalForce RAPC Worldwide, PC v. LegalForce, Inc.*, 124 F.4th 1122, 1125 (9th Cir. 2024) (citing 15 U.S.C. §§ 1114(1)(a), 1125(a)).  OpenAI does not dispute the first two elements.[8] Thus, the Court focuses only on the third element – likelihood of confusion – before turning to OpenAI's affirmative defense of fair use.[9]

### 1.    Trademark Infringement Claim

At the outset, it is important to understand Plaintiff's theories of confusion.  Although Plaintiff alleges theories of both forward and reverse confusion, the parties' briefing and arguments focused on forward confusion.  Finding that forward confusion is likely, the Court does not address reverse confusion in this Order.

In the trademark context, "[f]orward confusion occurs when consumers believe that goods bearing the [allegedly infringing mark] came from, or were sponsored by, the [original] mark holder."  *Yuga Labs, Inc. v. Ripps*, 144 F.4th 1137, 1163 (9th Cir. 2025) (citation omitted).  Here,

---

[8] As to the first element, Plaintiff has a protectable interest in its registered CAMEO® trademark. *See* Byron TRO Decl. Ex. 1; *see also Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (explaining that federal registration is "prima facie evidence of the validity of the mark[s], the registrant's ownership of the mark[s], and the registrant's exclusive right to use the mark[s] in connection with the goods specified in the registration").  As to the second element, OpenAI does not dispute that it is using an identical, non-stylized version of the CAMEO® mark on and in connection with the Sora application. *See* TRO Opp. at 13 (acknowledging "OpenAI's use of the term 'cameo'").

[9] Because Plaintiff has demonstrated a likelihood of success on its trademark infringement claim, the Court does not address the likelihood of success of Plaintiff's additional causes of action in this Order.

United States District Court
Northern District of California

1   Plaintiff is concerned that consumers will "mistakenly believe that OpenAI's 'Cameo' service is

2   sponsored by, endorsed by, or otherwise affiliated with Plaintiff and its CAMEO® trademark and

3   brand." Compl. ¶ 56. Plaintiff asserts that this mistaken association is likely to occur because

4   "OpenAI has entered into numerous high-profile partnerships and licensing deals with a wide

5   array of companies[.]" *Id.* (citing to "The Washington Post, Walmart, AMD, Vox Media, and

6   Reddit" as examples). From Plaintiff's perspective, its "CAMEO® brand is closely connected in

7   the consumer's mind with ***authentic*** celebrity-fan interactions," and OpenAI's use of "cameo"

8   threatens Plaintiff's reputation by associating Plaintiff's brand and mark with "AI slop and

9   deepfakes featuring celebrities." *Id.* ¶ 53.

10          To determine whether OpenAI's use of "cameo" is likely to cause confusion, the Court

11   considers the eight *Sleekcraft* factors: "(1) the strength of the mark; (2) proximity or relatedness

12   of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels

13   used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the

14   defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines."

15   *Doctor's Best, Inc. v. Nature's Way Prods., LLC*, 143 F.4th 1101, 1110 (9th Cir. 2025); *see also*

16   *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979). The *Sleekcraft* factors are

17   "illustrative rather than exhaustive, and best understood as simply providing helpful guideposts."

18   *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th

19   Cir. 2010). They are "intended as an adaptable proxy for consumer confusion, not a rote

20   checklist." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th

21   Cir. 2011). Thus, plaintiffs "need not satisfy every factor" to demonstrate a likelihood of

22   confusion. *Pom Wonderful*, 775 F.3d at 1125 (citation omitted). The Court addresses each factor

23   in turn, finding that five of the eight factors weigh in Plaintiff's favor, and the remaining three

24   factors are neutral.[10]

25

26

27   _____

[10] For the reasons stated in the TRO Order, the Court gives no weight to OpenAI's intent in selecting the "cameo" and the likelihood of product-line expansion. *See* TRO Order at 11-12.

28   Thus, the Court incorporates its prior findings and does not repeat its discussion in this Order.

United States District Court
Northern District of California

### a.    Strength of the mark

The strength of a mark is evaluated both conceptually and commercially. *Fortune Dynamic*, 618 F.3d at 1032. The more likely a mark is to be "remembered and associated in the public mind with the mark's owner," the stronger the mark is considered to be. *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 757 (9th Cir. 2018) (quoting *Network Automation*, 638 F.3d at 1149). Stronger marks are afforded greater protection than weak marks. *Pom Wonderful*, 775 F.3d at 1126. After evaluating both the conceptual and commercial strength of the mark, the Court finds that this factor weighs in Plaintiff's favor because of the mark's commercial strength.

### i.    Conceptual strength

"[A] mark's conceptual strength is proportional to the mark's distinctiveness," *adidas*, 890 F.3d at 757, and "is classified along an imperfect spectrum of distinctiveness [from weakest to strongest]: generic, descriptive, suggestive, arbitrary, and fanciful," *Yuga*, 144 F.4th at 1168 (internal quotations omitted). As the Ninth Circuit has noted, categorizing a mark's conceptual strength is "necessarily an imperfect science," with the categories "blur[ring] at the edges." *Fortune Dynamic*, 618 F.3d at 1033 (citation omitted). As relevant here, "[t]he line between descriptive and suggestive marks is nearly incapable of precise description." *Id.*

Although the Court previously concluded that Plaintiff's standard character CAMEO® mark, Registration No. 6,369,961, is presumptively suggestive, TRO Order at 7, it is of little import where the mark falls on the spectrum between suggestive and descriptive because in either case the mark is conceptually "relatively weak."[11] *Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1102 (9th Cir. 2004). However, this finding does not end the inquiry. The Court must also consider the commercial strength of the mark. *See Pom Wonderful*, 775 F.3d at 1126

---

[11] The Court's prior determination was based on OpenAI's concession that "the USPTO did not require evidence of acquired distinctiveness" for Registration No. 6,369,961. *See* TRO Order at 8 (citing TRO Opp. at 16 n.1); *see also Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1162 (9th Cir. 2021) (explaining that the USPTO registering a mark without proof of secondary meaning is *prima facie* evidence that the mark is at least suggestive). Now, OpenAI argues that the registration does not serve as evidence of the mark's suggestiveness because Plaintiff's prior "cameo" registrations served as "proof of secondary meaning" for Registration No. 6,369,961. MPI Opp. at 4. Because the distinction between descriptive and suggestive is not dispositive, the Court need not resolve the parties' dispute as to the significance of Registration No. 6,369,961.

1   (explaining that "placement within the conceptual distinctiveness spectrum is not the only

2   determinant of a mark's strength").

3                            ii.    **Commercial strength**

4          Even where a mark is conceptually weak, the Court must consider "whether the . . . mark

5   has achieved sufficient marketplace recognition to transform it into a strong mark."  *Id.*

6   (explaining that actual marketplace recognition can "transform a suggestive mark into a strong

7   mark" (citation omitted)); *see also Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1536

8   (9th Cir. 1989) ("A descriptive or suggestive mark may be strengthened by such factors as

9   extensive advertising, length of exclusive use, public recognition and uniqueness.").  Here,

10  Plaintiff has put forth evidence that its mark is commercially strong.  For example, Plaintiff has

11  shown that "Cameo and its video service have been featured in thousands of media articles and

12  reports," that its social media accounts have millions of followers, that its posts have generated

13  more than 100 million views in the past year, and that Cameo "is frequently mentioned on TV

14  shows like Saturday Night Live, The Tonight Show, and The Daily Show."  Compl. ¶ 2; *see also*

15  O'Connor TRO Decl. ¶¶ 9-11, 16 & Exs. 1-4.  This evidence is relevant to the strength of the mark

16  factor because it is indicative of whether the mark is likely to be "remembered and associated in

17  the public mind with the mark's owner."  *adidas*, 890 F.3d at 757.

18         OpenAI offers no evidence challenging the commercial strength of Plaintiff's mark.

19  Instead, OpenAI argues that Plaintiff's "conceptually weak mark" weighs against a likelihood of

20  confusion "irrespective of commercial strength."  MPI Opp. at 4 (citing *USPTO v. Booking.com*

21  *B.V.,* 591 U.S. 549, 562-63 (2020)).  *Booking.com* has no bearing on the analysis here because it

22  does not address the *Sleekcraft* factors at all, much less the proper weight afforded to commercial

23  strength where the mark is conceptually suggestive or descriptive.  Instead, *Booking.com*

24  considered whether a mark that combines a generic term, such as "booking," with a ".com"

25  domain name can ever be federally registered as a trademark.  *Id.* at 556-57.  The Supreme Court

26  held that "generic.com" names can be registered, so long as consumers do not understand them to

27  be generic.  *Id.* at 557 ("Because 'Booking.com' is not a generic name to consumers, it is not

28  generic.").  Accordingly, because Plaintiff has offered unrebutted evidence of the commercial

United States District Court
Northern District of California

1    strength of its mark, the Court finds that this factor favors Plaintiff.

2                    **b.        Relatedness of the goods**

3        "Goods and services are related when they are complementary, sold to the same class of

4    purchasers, or similar in use and function." *Ironhawk*, 2 F.4th at 1163 (citing *Sleekcraft*, 599 F.2d

5    at 350).  The parties do not have to be direct competitors for their goods to be related.  *Id.*  Instead,

6    "[r]elated goods (or services) are those 'which would be reasonably thought by the buying public

7    to come from the same source if sold under the same mark.'"  *Id.* (citation omitted).

8        As the Court previously explained, because OpenAI's "cameo" feature makes "hyperreal

9    videos," often featuring the same celebrity talent as Plaintiff's "authentic" Cameo Videos, the two

10   products may be indistinguishable to the consuming public when promoted under the same

11   "cameo" name.  *See* TRO Order at 8-9.  For example, Plaintiff produced two "happy birthday"

12   videos featuring Cameo talent Ricky Berwick.  *See* Raphael TRO Reply Decl. Exs. 4-5.  The first

13   video, ECF No. 32-4, is a nine second, Sora-generated AI video in which Berwick is seated in a

14   wheelchair in what appears to be his home.  In the video, Berwick wishes "Jordan" happy

15   birthday.  There are no obvious indicators that the video is AI-generated, such as Berwick being

16   on the moon or some other unrealistic feature.  The second video, ECF No. 32-5, is an "authentic"

17   Cameo Video of Berwick wishing "Jordan" happy birthday, again from what appears to be his

18   home.  Still images from the two videos illustrate the visual similarities.  *See* App. Figure 1.

19       OpenAI attempts to distinguish the parties' services and products, arguing that they are not

20   similar because Sora generates AI videos and Plaintiff's platform offers "customized recorded

21   videos."  MPI Opp. at 5.[12]  This argument "overemphasizes [the] differences in [the parties']

22   principal lines of business," rather than focusing on whether consumers are likely to associate the

23   products or services.  *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1056 (9th

24   Cir. 1999); *see also Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir.

25   1998) (explaining that "the relatedness of each company's prime directive isn't relevant").  In

26

27   ─────────────────

28   [12] OpenAI also states that Plaintiff "does not claim to generate AI videos," *id.*, but this is not true.
     Plaintiff alleges that it has offered AI-generated videos via Cameo Kids since 2022.  Compl. ¶ 5.

*Brookfield*, the Ninth Circuit held that the products were related, even though the plaintiff was an entertainment-industry information provider and the defendant was a video rental store chain. *Brookfield*, 174 F.3d at 1041, 1056.  Under the relatedness factor, it was enough that "both companies offer[ed] products and services relating to the entertainment industry generally, and their principal lines of business both relate[d] to movies."  *Id.* at 1056.  OpenAI's argument ignores the "competitive proximity of the products" and that "the products are used for similar purposes."  *Id.*

Here, the relatedness of the goods is even stronger than in *Brookfield*.  Both parties offer virtually indistinguishable products under the "cameo" name.  *See supra* Section I.  Both parties rely on celebrity and social media promotion.  *See id.*  And OpenAI has a history of high-profile partnerships.  *See* Byron TRO Decl. ¶¶ 30-34 & Exs. 27-34.  Thus, as has already *actually* happened, consumers are likely to reasonably believe that OpenAI's "cameos" originate from or are associated with Plaintiff's Cameo platform.[13]  *See infra* Section III.A.1.e.ii.  This factor weighs in Plaintiff's favor.

### c.    Similarity of the marks

OpenAI does not dispute that the mark used in connection with its Sora "cameo" feature is visually and phonetically identical to Plaintiff's standard character CAMEO® mark.  Indeed, it is the *same* word.  OpenAI's contention that the marks are not similar because it relies on a non-stylized version of "cameo" solely to describe a feature or function of the Sora application goes to the fair use defense, not to the similarity of the marks.  *See* MPI Opp. at 2-3 (arguing that the parties' uses of "cameo" are not similar because OpenAI's use is not stylized).  Even if it was relevant to this *Sleekcraft* factor, the "many visual similarities, perfect aural similarity, and perfect semantic similarity" weigh more heavily than any minor stylistic differences between the marks.

---

[13] The fact that videos created using OpenAI's feature are "watermarked with the 'Sora' name and logo" does not necessarily distinguish the parties' respective "cameo" videos.  TRO Opp. at 10.  This is particularly true here in light of Plaintiff's concern that others may mistakenly assume that Plaintiff has entered into a partnership or licensing agreement with OpenAI as to the use of its CAMEO® mark.  *See* Compl. ¶¶ 8, 42-43, 45, 54-55.  Moreover, there are examples in the record of Sora videos posted on the Sora website and shared by the Sora team that do not include the watermark.  *See* Scandinaro MPI Decl. ¶ 14 & Exs. 3-4, 6; Byron MPI Decl. Ex. 29 at 2; *id.* Ex. 30 at 3.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    *Pom Wonderful*, 775 F.3d at 1129-30 (holding that similarity of the marks weighed in favor of the

2    plaintiff even though "the presentation of the marks differ[ed] in terms of prominence, font, size,

3    and capitalization" because the spelling, pronunciation, and meaning were identical); *see also IYO,*

4    *Inc. v. IO Prods., Inc.*, No. 25-4028, 2025 WL 3471705, at *2 (9th Cir. Dec. 3, 2025) (explaining

5    that similarity of the marks is always important, and is "tested on three levels:  sight, sound, and

6    meaning").  Therefore, this factor weighs heavily in Plaintiff's favor, particularly in light of the

7    relatedness of the services.  *Network Automation*, 638 F.3d at 1150 ("[T]he more similar the marks

8    in terms of appearance, sound, and meaning, the greater the likelihood of confusion.").

9                              **d.    Degree of consumer care**

10          The Court finds that the type of goods and degree of consumer care factor is neutral.  This

11   factor asks "whether a 'reasonably prudent consumer' would take the time to distinguish between

12   the two product lines."  *Ironhawk*, 2 F.4th at 1167.  Historically, the degree of consumer care

13   analysis has focused on the degree of care exercised in making a *purchase*.  *See Yuga*, 144 F.4th at

14   1171.  Here, although the Sora application is presently offered for free, OpenAI argues that this

15   factor weighs against a likelihood of confusion because consumers can only create a "cameo" – on

16   either platform – after completing a multi-step process, including downloading the respective

17   application, registering for an account, and providing a prompt for the desired video.  MPI Opp. at

18   6-7.  Thus, through this process, consumers are provided "the opportunity to realize their mistake

19   at multiple points."  *Pinterest, Inc. v. Pintrips, Inc.*, 140 F. Supp. 3d 997, 1019 (N.D. Cal. 2015)

20   (finding that threshold processes required to access the parties' services cuts against likelihood of

21   confusion).  The Court credits this argument and gives it due weight.

22          On the other hand, while this process may eliminate the risk of mistakenly generating a

23   video through the wrong service, it does not guard against confusion as to association or

24   sponsorship, which is a concern in this case.  *Sleekcraft*, 599 F.2d at 353 ("The hallmark of a

25   trademark owner's interest in preventing use of his mark on related goods is the threat such use

26   poses to the reputation of his own goods.");  *see also* Compl. ¶¶ 53, 56, 69 ("As a result of

27   Defendants' unauthorized use of the CAMEO® trademark, the public is likely to be misled and

28   confused as to the source, sponsorship, association, approval, or affiliation of [Defendants']

1    products and services, or vice-versa.").  As discussed below, Plaintiff asserts and provides actual

2    examples of such confusion.  *See infra* Section III.A.1.e.ii.  Thus, based on the record before it, the

3    Court concludes that this factor favors neither party.

4                          **e.    Evidence of actual confusion**

5             Evidence of actual confusion is not required to show a likelihood of confusion under the

6    Lanham Act.  *Yuga*, 144 F.4th at 1170-71 (citation omitted).  At the preliminary injunction stage,

7    parties often have not had the opportunity to amass "significant evidence of actual confusion."

8    *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.,* 758 F.3d 1069, 1072-73 (9th Cir. 2014).  That

9    is true here:  The preliminary injunction hearing was held less than three months after OpenAI's

10   product launched.  Although evidence of actual confusion is not required, both Plaintiff and

11   OpenAI argue that this factor weighs in their favor.  Plaintiff submits a consumer survey

12   conducted by its expert David Franklyn along with examples of actual confusion on social media

13   and in the marketplace generally.  OpenAI submits an expert report containing two consumer

14   surveys.  The Court reviews the survey evidence and other evidence submitted by the parties, and

15   concludes that this factor weighs in favor of Plaintiff.

16                          **i.    Survey evidence**

17            Consumer surveys may be used to establish actual confusion under *Sleekcraft*.  *Fortune*

18   *Dynamic*, 618 F.3d at 1035.  One of the most common survey formats in the trademark

19   infringement context is the Eveready survey, which the parties used here.  1 J. Thomas McCarthy,

20   *McCarthy on Trademarks & Unfair Competition* § 11:45 (5th ed. 2025) ("McCarthy").  The

21   Eveready survey is "widely regarded as an appropriate method of testing for likelihood of

22   confusion."  *Id.*  In a standard Eveready survey, respondents are shown a single stimulus depicting

23   the allegedly infringing junior mark, and are asked "the open-ended source question, 'Who makes

24   or puts [this] out?'"  Jerry B. Swann, *Eveready and Squirt – Cognitively Updated*, 106 Trademark

25   Rep. 727, 729 (2016); *see also* McCarthy § 32:174.  The source question is followed by – "Why

26   do you say that?" – which can confirm whether respondents associate the junior use with the

27   senior mark.  Swann, *supra*, at 730-32.  The standard Eveready format can be modified to measure

28   confusion related to sponsorship or affiliation.  McCarthy § 32:175 ("Do you think this product

United States District Court
Northern District of California

13

was approved, licensed or sponsored by another company or not?"  And if yes then, "What company do you think this product is approved, licensed or sponsored by?" followed by "Why do you say that?").

"[A] showing of actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion." *Network Automation*, 638 F.3d at 1151.  When considering consumer surveys, courts generally treat net rates of confusion below 10% as evidence "that confusion is not likely," and "rates between 10% and 20% as evidence that confusion is likely when other evidence is supportive."  *World Champ Tech, LLC v. Peloton Interactive, Inc.*, No. 24-2266, 2025 WL 2673906, at *2 (9th Cir. Sep. 18, 2025) (cleaned up) (quoting McCarthy §§ 32:188-189).

Here, Plaintiff and OpenAI submit Eveready surveys as evidence of actual confusion or lack thereof.  OpenAI's expert Laura O'Laughlin conducted two Eveready surveys – one measures the confusion within the Sora application (resulting in a confusion rate of 10% adjusted down to 7%), and the other measures confusion on OpenAI's webpage prior to downloading Sora (confusion rate of 0%).[14]  Plaintiff's expert David Franklyn conducted one Eveready survey – using the stimuli of a third-party post regarding Sora's "cameo" feature (confusion rate of 14%).[15] Not surprisingly, both sides challenge the opinions of the other's expert, pointing to perceived flaws in their methodology and questioning the reliability of the survey results.  These questions "go to the weight of the survey rather than its admissibility." *Fortune Dynamic*, 618 F.3d at 1038. Thus, the Court reviews each survey, considering the criticisms levied against it, and accords each the appropriate weight.  Although evidence of actual confusion is not required, the Court finds that the survey results – particularly the non-discounted rate in OpenAI's App Eveready Survey – supports a finding of actual confusion when considered with the other evidence offered by

---

[14] O'Laughlin is a principal at Analysis Group, Inc., a consulting firm that provides "economic, financial, statistical, and business strategy consulting to law firms, corporations, and government agencies."  O'Laughlin Report ¶ 1, ECF No. 46-3.

[15] Franklyn is a professor and the executive director of the McCarthy Institute at the Arizona State University Sandra Day O'Connor College of Law.  Franklyn Report App. A, ECF No. 54-1.

United States District Court
Northern District of California

Plaintiff.[16]

*OpenAI's App Eveready Survey:*  The App Eveready Survey presented respondents with stimuli replicating a user's experience navigating the Sora application from a smart phone. O'Laughlin Report ¶ 50.  The survey presented the user flow of the Sora application that Plaintiff identified in its TRO Application.  O'Laughlin Report ¶ 47; *see also* Raphael TRO Reply Decl. ¶ 16 & Ex. 8.  Respondents were shown eight full-screen images and a video, which were displayed one at a time with instructions between each image.  O'Laughlin Report ¶ 50.  The survey aimed to replicate the user flow from "opening the app, interacting with different app features, viewing top users, selecting and viewing a contributor's profile who has made their likenesses available to other Sora users, selecting the Sora cameo feature, entering a prompt to create a video featuring the selected contributor, [to] seeing the resulting video."  *Id.*  The test group was shown the user flow with "cameo" as it appears in the Sora application; the control group was shown the same user flow with the word "spotlight" replacing "cameo."  *See* App. Figure 2; *see also* O'Laughlin Report ¶ 49.

After reviewing all the images and the resulting video, respondents were asked:  "Who or what company do you believe provides the *app* you saw?"  O'Laughlin Report ¶ 55 (emphasis added).  They were then asked the following question to test the level of certainty in their answer:

---

[16] OpenAI objects to the supplemental declaration by Jordan Raphael ("Raphael Supplemental Declaration") and the supplemental declaration and report submitted by Franklyn ("Franklyn Supplemental Report").  ECF Nos. 55 (Raphael Suppl. Decl.), 56 (Franklyn Suppl. Report).  OpenAI argues that these materials are untimely because they were produced after the December 1, 2025, "deadline to produce additional evidence" for the preliminary injunction proceedings. ECF No. 43.  OpenAI's objection to the Raphael Supplemental Declaration, as well as related references and demonstratives, is sustained because the declaration offers new evidence and it was not filed until December 12, though the Court acknowledges that this evidence did not exist as of the December 1 deadline.  By contrast, OpenAI's objection to the Franklyn Supplemental Report is overruled.  Although this report was also filed after the deadline, neither the Court nor the parties addressed the timing of rebuttal expert reports at the November 14, 2025, hearing. Generally, a reply brief may be filed with supporting "affidavits or declarations" – only "new evidence" is prohibited.  Civil L.R. 7-3(c), (d).  The Franklyn Supplemental Report is not "new" evidence because it properly responds to issues raised in OpenAI's opposition and related materials, including OpenAI's expert report.  *See Hodges v. Hertz Corp.*, 351 F. Supp. 3d 1227, 1249 (N.D. Cal. 2018).  Moreover, because OpenAI's expert opined on the substance of Franklyn's initial report, it would be prejudicial to deny Plaintiff the opportunity to engage with OpenAI's expert evidence.  *See* O'Laughlin Report ¶¶ 63-82 (rebutting Franklyn's initial report); Wind Report ¶¶ 68-108, ECF No. 46-7 (rebutting Franklyn's initial report).

United States District Court
Northern District of California

"In a previous question, you said you believe [company name] provides the video service you saw. How likely do you think that your answer is correct?" *Id.* ¶ 60 n.100 & App. E.1-30. Respondents could choose from the following:  just guessing, somewhat likely correct, very likely correct, or definitely correct.  O'Laughlin Report App. E.1-30.  This question was followed by: "What other company or companies do you believe have a business relationship (e.g. affiliation, sponsorship, or other connection) with whoever provides the app that you saw?" *Id.* ¶ 55.  Where the respondent answered that they believed there was a business relationship, they were asked to type the name of the company in a textbox. *Id.* App. E.1-32.  Respondents that typed in a company name were asked the question regarding their certainty of confusion.  *Id.* App. E.1-33.

OpenAI's App Eveready Survey found a net confusion rate of 10%,[17] with 11% of users in the test group indicating that "Cameo" or "Baron App" either provided the application or had some sort of business relationship with the provider of the app.[18]  *Id.* Ex. 6.A ("App Eveready Survey Responses Before Assessment of Certainty").  Respondents' stated reasons for believing the application was provided by or affiliated with Cameo are notable.  They included that the application "looks like cameo," that Cameo "is mentioned on most screens," that it has "multiple influencers in the app doing cameos similar to the cameo app," and that Cameo is "the only company I've ever heard of that does this."  *Id.* Ex. 8 ("Reasons for Confusion in App Eveready Survey Responses").  These responses mirror the concerns raised in the complaint.  *See* Compl. ¶¶ 53, 56, 69.

As discussed earlier, courts generally treat a confusion rate of 10% as evidence that confusion is likely when other evidence supports such a finding.  *World Champ*, 2025 WL 2673906, at *2.  However, here, the confusion rate in the survey was adjusted from 10% to 7% to account for "respondents' certainty level."  O'Laughlin Report ¶ 60; *see also id.* ¶ 59 n.97 (citing Barton Beebe *et al.*, *Consumer Uncertainty in Trademark Law: An Experimental Investigation*, 72

---

[17] The net confusion rate was calculated by subtracting the confusion rate in the control group from the confusion rate in the test group.  *Id.* ¶ 44.

[18] A total of 601 respondents completed the App Eveready Survey, with 301 individuals in the test group and 300 in the control group.  *Id.* ¶ 56.

Emory L.J. 489, 537 (2023)).  This adjustment was based on a 2023 law review article, which added a certainty question to the traditional Eveready survey format.  Beebe, *supra*, at 535 n.179. As applied to the App Eveready Survey, O'Laughlin asked respondents:  "How likely do you think that your answer is correct?"  O'Laughlin Report ¶ 60 n.100.  Respondents could choose from:  "very likely correct," "definitely correct," "somewhat likely correct," and "just guessing." Respondents that selected "just guessing" or "somewhat likely correct" were excluded from the net confusion rate.  O'Laughlin Report ¶¶ 60-61.  This exclusion resulted in the 3% downward adjustment.  *Id.*

Plaintiff's expert David Franklyn opines that this methodology is not standard practice in conducting trademark surveys.[19]  Franklyn Suppl. Report at 9-10 (noting that the confusion certainty questions were "non-standard" and explaining why it was improper to remove respondents who indicated that they were confused).  As noted, the question and response options were based on one law review article, the title of which suggests that the authors engaged in "an experimental investigation."  *See* Beebe, *supra*, at 534-37 (discussing a *single* experimental Eveready survey).  OpenAI does not cite to any case adopting this methodology; nor was the Court able to find one.  Based on the record before it, particularly given the respondents' stated reasons for their confusion, the Court is unconvinced that the further adjustment was appropriate, and gives weight to the original 10% net confusion rate.[20]

---

[19] Franklyn also opines that the App Eveready Survey suffers from three additional flaws that render the results irrelevant or lead to undercounting:  (1) improper universe of respondents, (2) improper survey questions that draw respondents' attention away from the allegedly infringing mark, and (3) an overly long and onerous stimulus in the App Eveready Survey.  *See* Franklyn Suppl. Report at 4-5.  The Court focuses on the use of the certainty question.

[20] The authors who conducted the experimental survey design were concerned that Eveready survey respondents might "have no actual beliefs" about the subject of the survey, but might nonetheless offer an opinion "in a bid to be helpful to the researcher."  Beebe, *supra*, at 537. Perhaps the authors had cause for this concern based on the single survey they conducted:  79.3% of confused respondents admitted they were "just guessing" or believed they were only "somewhat likely correct."  *Id.* at 535-36.  Here, by contrast, O'Laughlin did not observe the same evidence of uncertainty.  To the contrary, respondents offered reasons for associating the Sora application with Plaintiff, thereby indicating that respondents had some basis for, and confidence in, their beliefs.

United States District Court
Northern District of California

1     ***OpenAI's Webpage Eveready Survey:***  The Webpage Eveready Survey used OpenAI's

2     webpage describing the Sora application as the stimulus.  O'Laughlin Report ¶ 16.  According to

3     O'Laughlin, this survey was designed to assess the likelihood of confusion "at an earlier stage of

4     the consumer journey" before potential consumers download the Sora application.  *Id.* ¶ 47.  The

5     test group was shown a version of the webpage that includes the term "cameo," as it appears on

6     the actual Sora website, and the control group was shown an identical version of the website, save

7     for replacing the word "cameo" with the word "spotlight."  *Id.* ¶¶ 16-17.  The word "cameo" or

8     "spotlight" only appeared twice, in small font, among numerous images and significant text.  *See*

9     *id.* App. D.2-1 to D.2-14.  Respondents were asked the same questions as in the App Eveready

10    Survey, including the same certainty question, except the language was modified for the webpage

11    stimulus.[21]  *Id.* ¶¶ 31, 36, 39.  No respondents in the test group identified "Baron App" or

12    "Cameo" as the video service provider or as having a business relationship with the video service

13    provider.  *Id.* ¶¶ 43-44.  Thus, the Webpage Eveready Survey found a net confusion rate of 0%.

14    *Id.* ¶ 12(a).

15        In his rebuttal report, Franklyn opines that the same methodological flaws apply to both

16    O'Laughlin surveys.  *See supra* n.19 (citing Franklyn Suppl. Report at 4-5).  Perhaps most

17    significantly, Franklyn concludes that the question designed to measure source confusion – "Who

18    or what company do you believe provides the video service?" – improperly diverts respondents'

19    attention away from the allegedly infringing *feature*.  *See* Franklyn Suppl. Report 5, 14-15.  He

20    explains that the question "encourages an understanding that the question is asking about the

21    'webpage' . . . and leads respondents away from considering the 'cameo' feature."  *Id.* at 5; *see*

22    *also id.* at 14 (explaining that the "cameo" feature is causing confusion, not the name of the

23    application ("Sora")).  Franklyn asserts that this is a "critical flaw" that likely decreased the rate of

24    confusion detected by the survey.  *Id.* at 14.

25        In any event, taking the 0% net confusion rate at face value, the Court finds this survey is

26    of little probative value because Plaintiff's theory of confusion centers around OpenAI's repeated

27    _____

28    [21] Specifically, as to source confusion, respondents were asked:  "Who or what company do you believe provides the video service you saw?"  O'Laughlin Report ¶ 31.

United States District Court
Northern District of California

use of "cameo" on the Sora application and in promoting Sora on social media.  *See also* Compl.

¶¶ 7, 10, 13, 40, 44, 47 (all focusing exclusively on the Sora application and the "cameo" feature

therein); Byron MPI Decl. Exs. 29-30 (social media posts about the Sora "cameo" feature); *see*

*also* MPI Reply at 6 ("[T]he web survey addresses a webpage use of 'cameo' that minimally

relates to [Plaintiff's] theories of confusion.").  The webpage is only one example of OpenAI's use

of "cameo," and does not capture the prominence or repetition of "cameo" as consumers encounter

it on the Sora application.  *Compare* App. Figure 2 (webpage), *with* App. Figure 3 (Sora

application).  At most, the Webpage Eveready Survey shows that the webpage, *standing alone*, is

not likely to confuse consumers.  It is of minimal assistance in assessing the overall impact of

OpenAI's use of "cameo," including within the Sora application or in promoting Sora on social

media.  Thus, the Court affords this survey limited weight.

   ***Plaintiff's Eveready Survey:***  Plaintiff's Eveready Survey presented respondents with the

image of a real post by Mark Cuban on X (f.k.a. Twitter), in which Mark Cuban writes:  "For

those of you on Sora, my Cameos are open.  Have at it."  Franklyn Report at 5-6, 21.  The test

group saw the original post, and the control group saw an exact duplicate of the original post,

except that "Cameos" was replaced with "Casts."  *Id.* at 20-21; *see also* App. Figure 4.

Respondents were asked in separate questions:  "What company do you think the post refers to?",

whether they think the company referred to in the post is sponsored or approved by another

company, and whether they think the company is affiliated with another company.  Franklyn

Report at 24-30.  If respondents indicated that they believed there was sponsorship, approval, or

affiliation with another company, respondents were asked to type the name of the other company

in a text box, and given an option to select "I don't know / not sure."  *Id.* at 27.  Finally,

respondents who indicated "Cameo" was the company referred to in the post or otherwise

sponsored, approved, or was affiliated with the post, were asked a disambiguation question.  *Id.* at

31-32 (asking what other services were provided by Cameo).  The survey found a net confusion

rate of 14.4%.  *Id.* at 35.  There was 0% confusion amongst those respondents viewing the post

that used "Casts" in place of "Cameo."[22]  *Id.* at 34.

OpenAI argues that the Franklyn Survey "sheds no light on whether OpenAI's use – the only use at issue – is likely to cause confusion" because it relies on a third-party post.  MPI Opp. at 8 (citing O'Laughlin Report ¶¶ 64-70).  However, the stimulus for Franklyn's survey is a post shared on social media by the Sora Head.  *See* Franklyn Report at 3-4 (explaining that celebrity posts promoting Sora's "cameo" feature were "viewed by millions" and that the stimulus post was reshared by Peebles and Sahai); *see also supra* Section I.B.2. (explaining that OpenAI relied on celebrity promotion of the Sora application).  Thus, the Court disagrees that Cuban's post is an irrelevant stimulus.[23]

In her report, O'Laughlin also identifies other possible methodological flaws concerning the stimulus and corresponding questions.  O'Laughlin Report ¶¶ 63-82 (questioning reliability of the Franklyn methodology).  For example, respondents were asked what *company* is referred to in the post, but neither "Sora" nor its "cameo" feature are companies.  *Id.* ¶¶ 68-69.  Additionally, the presence of "X.com" in the stimulus provides an additional company that may have confused respondents.  *See* App. Figure 4.  This is borne out in the underlying survey data, which shows that several respondents indicated that the post "referred" to "X" or "Twitter."  *See* Franklyn Report App. E.  Given these concerns, the Court affords little weight to this survey in analyzing the actual confusion factor.

### ii.    Other evidence of actual confusion

Because the Court accorded greater weight to OpenAI's App Eveready Survey and its unadjusted net confusion rate of 10%, the Court looks to see whether other evidence supports a

---

[22] A total of 383 respondents completed the survey, with 194 individuals in the test group and 189 in the control group.  *Id.* at 33.

[23] OpenAI's expert also opines that the Cuban post does not reflect how OpenAI uses "cameo" because "cameo" is capitalized in Cuban's post, and OpenAI and its employees typically do not use "cameo" as a proper noun and do not capitalize it.  *See* O'Laughlin Report ¶ 65.  This argument is not persuasive.  As demonstrated by OpenAI's own survey, OpenAI repeatedly capitalizes "Cameo" on the Sora application.  *See* App. Figure 2.  OpenAI has also capitalized "Cameo" on its own website.  *See* Byron MPI Decl. Ex. 3.  Finally, that OpenAI employees do not capitalize "cameo" on social media is of little significance because OpenAI employees frequently use all lower-case text in their social media posts, including when referencing Sora.  *See, e.g.*, Raphael TRO Reply Decl. Ex. 3 at 2, 4, 8-10.

finding of actual confusion.  *World Champ*, 2025 WL 2673906, at *2.  The Court finds that it

does.  Plaintiff has provided evidence showing:  (1) its social media accounts have been

mistakenly tagged in reference to Sora's "cameo" feature, Compl. ¶¶ 47-49 (attaching images);

(2) Plaintiff has received misdirected customer service inquiries about Sora's "cameo" feature,

Galanis TRO Reply Decl. ¶¶ 16, 19; and (3) users on the popular discussion-board platform,

Reddit, have been confused by OpenAI's use of "cameo," Scandinaro MPI Decl. Ex. 11.  In

addition, Cameo's co-founder attests that, in the days following the announcement of Sora 2, he

was asked "on multiple occasions" if Cameo "had partnered with OpenAI," and was asked for

invite codes to join Sora.  Galanis TRO Reply Decl. ¶ 19.  Because the net confusion rate is 10%

and "other evidence is supportive" of a likelihood of confusion, the Court finds that this factor

weighs in favor of Plaintiff.  *World Champ*, 2025 WL 2673906, at *2.

### f.    Marketing channels used

The Court next considers the marketing channels used by the parties because "[c]onvergent

marketing channels increase the likelihood of confusion."  *Yuga*, 144 F.4th at 1171 (quoting

*Sleekcraft*, 599 F.2d at 353).  "In assessing marketing channel convergence, courts consider

whether the parties' customer bases overlap and how the parties advertise and market their

products."  *Pom Wonderful*, 775 F.3d at 1130 (citation omitted).  Where the identified marketing

channel is overly broad or a commonly used marketing method, such as marketing on the internet

or marketing by "word-of-mouth," the Ninth Circuit does not give much weight to this factor.  *See*

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004) ("PEI

and the advertisers use identical marketing channels:  the Internet. . . . Given the broad use of the

Internet today, the same could be said for countless companies.  Thus, this factor merits little

weight."); *Pinterest*, 140 F. Supp. 3d at 1018-19 (giving no weight to the marketing channel factor

where the plaintiff failed to point to any advertising activity that distinguishes the parties' internet

advertising from the internet advertising of any other company).

Here, however, both parties employ a unique marketing strategy relying on celebrity

promotion of "cameo" videos that are at times indistinguishable.  *See supra* Section I.  Given the

United States District Court
Northern District of California

close visual similarity of the products, the overlapping marketing strategy is likely to confuse consumers.  Thus, this *Sleekcraft* factor also favors Plaintiff.

* * *

In sum, the *Sleekcraft* factors weigh heavily in favor of a likelihood of confusion.

### 2.    Fair Use Defense

Having found that Plaintiff has established a likelihood of success on the merits of its trademark infringement claim, the burden shifts to OpenAI to show a likelihood that its fair use defense will succeed.  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007); *see also 2Die4Kourt v. Hillair Cap. Mgmt., LLC*, 692 F. App'x 366, 368 (9th Cir. 2017).  To prevail on a fair use defense, the defendant must satisfy three conditions:  (1) that it is not using the word or phrase as a trademark, (2) that it is using it in a descriptive sense to describe its goods or services, and (3) that it is using it in good faith.  *Fortune Dynamic*, 618 F.3d at 1039; 15 U.S.C. § 1115(b)(4).  The overall analysis focuses on whether the use is "objectively fair."  *Fortune Dynamic*, 618 at 1039 (quoting *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 123 (2004)).  This is an intensely factual analysis most often resolved by the jury.  *Id.*

The Court first addresses whether OpenAI is using cameo as a mark, and then addresses whether such use is descriptive.  Because the Court finds that OpenAI has not demonstrated a likelihood of success as to either of these elements, the Court declines to address good faith.

### a.    Use as a mark

"To determine whether a term is being used as a mark, [courts] look for indications that the term is being used to 'associate it with a manufacturer.'"  *Fortune Dynamic*, 618 F.3d at 1040 (quoting *Sierra On-Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1423 (9th Cir. 1984)).  "Indications of trademark use include whether the term is used as a 'symbol to attract public attention,' which can be demonstrated by 'the lettering, type style, size and visual placement and prominence of the challenged words[.]'"  *Fortune Dynamic*, 618 F.3d at 1040 (citations omitted).  Other indications include the duration and scope of use, whether the term is used for branding or sub-branding, and whether it is used directly on the product.  *See generally Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013) (scope of use and sub-branding); *Cosmetically Sealed*

United States District Court
Northern District of California

United States District Court
Northern District of California

*Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30-31 (2d Cir. 1997) (duration of use and whether the term is used directly on the product); *Calmese v. NIKE, Inc.*, No. 06-cv-1959-PHX-ROS, 2007 WL 9724587, at *1 (D. Ariz. Mar. 6, 2007) (single advertising campaign); *Bell v. Harley Davidson Motor Co.*, 539 F. Supp. 2d 1249, 1258, 1260 (S.D. Cal. 2008) (scope of use and whether the term is the exclusive term or slogan associated with the product).

OpenAI's discussion regarding the "use as a mark" element is limited. It argues that it does not use "cameo" in a stylized manner, "as would be expected if OpenAI intended to use it as a mark." MPI Opp. at 10-11. However, the "use as a mark" analysis is not so rigid, and stylized font is but one indicator. The Second Circuit's decision in *Kelly-Brown* is illustrative. After the district court found that Oprah's use of the phrase "Own Your Power" was fair use as a matter of law, the Second Circuit reversed, concluding that the plaintiff adequately alleged Oprah's repeated and ongoing use of the phrase constituted use as a mark. *Kelly-Brown*, 717 F.3d at 308-311. The Second Circuit explained that an array of uses, including using the phrase on the cover of a magazine, on signage and promotional materials related to an event, and in articles provided on Oprah's website, was sufficient to infer a pattern of use. *Id.* at 308-09 ("Courts are more likely to treat recurring themes or devices as entitled to protection as a mark, even where a single iteration might not enjoy such protection."). The Court further explained that it was plausible that the pattern of use was designed to create a "symbolic shorthand" to remind consumers of Oprah-related content. *Id.* at 310. The fact that Oprah's name was plainly attached to all uses of the phrase did not prove that the phrase was not used as a mark. *Id.* at 310 ("Nor is a defendant's use of a term in conjunction with its own trademark *per se* a use other than as trademark."). This was particularly true given the plaintiff's theory that the use of the phrase was an attempt to create a sub-brand, even if the "ultimate source" was the larger Oprah brand. *Id.* at 308-09.

Here, Plaintiff claims that OpenAI used "cameo" as a mark by its repeated and prominent use of "cameo" in connection with the Sora application. *See* MPI Opp. at 8-9. As in *Kelly-Brown*, OpenAI's use of "cameo" is designed to create a "symbolic shorthand" or sub-brand between "cameo" and Sora. OpenAI touted the "cameo" feature as "unique to Sora 2," and promoted it as Sora's defining feature. *See* Raphael TRO Reply Decl. ¶ 5 ("[T]here's one feature above all else

United States District Court
Northern District of California

1  that we're really pumped about.  It's a new feature called Cameo and it's unique to Sora 2.");

2  Sahai TRO Decl. Ex. A ("We think a social app built around this 'cameos' feature is the best way

3  to experience the magic of Sora 2."); Byron MPI Decl. Ex. 29 at 7 (stating that the feature "will

4  change the world").  In addition, not only is the feature called "cameo," but OpenAI has branded

5  the resulting videos and the AI-likeness used to create the resulting video as "cameos."  *See supra*

6  Section I.A.2.  Finally, the record is replete with examples of OpenAI employees and Sora's

7  leader linking Sora with the word "cameo."[24]  *See, e.g.*, Byron MPI Decl. Ex. 3 (OpenAI website);

8  *id.* Ex. 29 at 2-9, 11-12 (Gabriel Peters posts); *id.* Ex. 30 at 2, 4-6, 8-12 (Bill Peebles posts); Sahai

9  TRO Decl. Ex. D (Sora 2 announcement video).  And in some instances, "cameo" is used without

10  any reference to Sora at all, with the speaker trusting that "cameo" will serve as reference enough

11  that they mean Sora's "cameo" feature.  *See, e.g.*, Byron MPI Decl. Ex. 29 at 4, 5; *id.* Ex. 30 at 6.

12  This pattern of use is designed to "forge[] an association in the minds of consumers" between

13  "cameo" and "Sora."  *Kelly-Brown*, 717 F.3d at 310.

14          In sum, OpenAI launched an ongoing promotional campaign with "cameo" taking center

15  stage as a sub-brand connected with the Sora application.  This is indicative of the use of "cameo"

16  as a mark.  Given OpenAI's lack of rebuttal evidence, OpenAI has failed to meet its burden as to

17  this element.

18                              **b.    Descriptive use**

19          The Court turns next to whether OpenAI is using the word "cameo" "only to describe [its]

20  goods or services."  15 U.S.C. § 1115(b)(4).  To prevail on this second element, OpenAI "must

21  establish that it used the word 'in [its] primary, descriptive sense' or 'primary descriptive

22  meaning.'"  *Fortune Dynamic*, 618 F.3d at 1041.  The primary descriptive meaning of a word is

23  the meaning that existed prior to the plaintiff's use of the word.  McCarthy § 11:45.  Thus, what is

24  given trademark protection is the "penumbra or fringe of secondary meaning which surrounds the

25  old descriptive word."  *Id.*; *see also Brookfield*, 174 F.3d at 1056 ("[T]he rights of the owner of a

26  registered trademark . . . extend to any goods related in the minds of consumers[.]").  OpenAI

27

28  [24] As discussed *supra* Section I.A.2., OpenAI's use of "cameo" and "sora" on social media is
    relevant because social media is the primary marketing channel for Sora and the "cameo" feature.

argues that its use of "cameo" is merely descriptive, describing the "function" of the Sora application.  MPI Opp. at 9-10.  The Court disagrees.

At the TRO stage, OpenAI relied on three dictionary definitions of cameo:  (1) "a brief appearance of a prominent actor or celebrity, as in a single scene of a motion picture"; (2) "a usually brief literary or filmic piece that brings into delicate or sharp relief the character of a person, place, or event"; and (3) "to make a brief appearance, as in a film."  TRO Opp. at 15-16 (citing Caruso TRO Decl. ¶¶ 4-5 & Exs. A-D, ECF No 30-1).  The Court explained that these definitions indicate that cameo means something more than a short video that includes a celebrity or character.  TRO Order at 13-14.  Thus, the Court concluded that OpenAI's use of "cameo" was not "purely" descriptive of the cameo feature because it suggests rather than describes the feature. *Id.*; *see also Fortune Dynamic*, 618 F.3d at 1042 ("Thus, as a defendant's use of a term becomes less and less purely descriptive, its chances of prevailing on the fair use defense become less and less likely.").

Now, in its opposition to the preliminary injunction motion, OpenAI adds two new, more expansive definitions of cameo:  (1) "a brief appearance";[25] and (2) "a small part in a game, activity, event, etc."  MPI Opp. at 9-10.  Rather than supporting OpenAI's defense, these definitions reinforce the notion that a "cameo" appearance constitutes a "small" or "brief" portion of a larger work or that the appearance is somehow unexpected.  The proposed definitions do not suggest *any* appearance is a "cameo."  Professor Yoram (Jerry) Wind, OpenAI's fair use expert identifies a series of headlines that demonstrate this point:  "Dog makes sudden Zoom cameo"; "The East Asian expert and his family became social media celebrities last week, after his daughter and baby made accidental cameo appearances in the background of his live"; and "Meteorologist's Toddler Makes Unexpected, Adorable Cameo On Live TV."  Wind Report ¶ 32. In each example, the "cameo" is the brief or *unexpected* appearance of an animal or child, not the *expected* appearance of the expert host or the meteorologist on live television.

OpenAI does not use cameo in its ordinary sense to refer to a brief or unexpected

[25] This definition is duplicative of the third definition proposed in the TRO briefing, except OpenAI omits the "as in a film" qualifier.

United States District Court
Northern District of California

United States District Court
Northern District of California

appearance.  It uses cameo to refer to any short video, irrespective of the nature of the appearances therein.  For example, the Berwick Sora video (discussed *supra* Section III.A.1.b.) exclusively features Berwick wishing "Jordan" a happy birthday.  Despite the video itself being "brief," Berwick is the primary subject of the video, and his appearance is neither unexpected nor brief relative to the video as a whole.  The use of "cameo" to describe the Sora video does not comport with any articulable ordinary or dictionary definition of cameo.  Rather, to the extent it is descriptive at all, it would seem to derive from Plaintiff's use of its CAMEO® mark.  In that respect, OpenAI benefits from Plaintiff's goodwill through its use of "cameo" to refer to similar videos in the online context.

Finally, OpenAI's expert opines that other tech companies' use of "cameo" to describe similar features supports the conclusion that OpenAI is using "cameo" descriptively.  Wind Report ¶¶ 38-42; *see also* TRO Opp. at 17-18 (citing *Pinterest*, 140 F. Supp. 3d at 1026, for the proposition that OpenAI's use of "cameo" is purely descriptive).  OpenAI's use of "cameo" is distinguishable from *Pinterest*.  There, the court found that the defendant's use of "pin" to describe "the act of attaching one virtual object to another" was purely a descriptive use because "the words pin and pinning have been used *for over twenty years* to describe the act of attaching one virtual object to another [online], much like one would use a physical pin to attach an object to a cork board."  *Pinterest*, 140 F. Supp. 3d at 1024 (emphasis added) ("Pintrips produced substantial evidence at trial that the terms pin and pinning have concrete and well-known meanings in both the computing field generally and the social media field specifically.").

Here, by contrast, OpenAI's expert points to only two other tech companies offering a "cameo" feature.[26]  *See* Wind Report ¶¶ 38-42.  First, Microsoft offers a "cameo" feature that allows users to "live camera stream directly into their PowerPoint presentation."  *Id.* ¶ 41.  Second, in 2019, Snapchat released a "Cameo" feature that allowed users to "edit [their] face to

---

[26] The Wind Report also identifies "CameoTunes," which uses cameo in its name.  Wind Report ¶ 42.  This app is available on the Apple app store with the following description:  "Cameo Tunes immerses you into the vibrant culture of The Bahamas through music."  *Id.*  The most recent version of the app is from 2019.  *Id.*

create zany deepfake-style clips." *Id.* ¶ 39.  This feature is no longer available under the name "Cameo." *Id.*  Neither use "cameo" to refer to a feature that allows users to generate short realistic videos.  Even if they did, such uses do not amount to "well-known" and "decades-old" use to describe a particular internet function, as was the case in *Pinterest*.  140 F. Supp. 3d at 1025.  Thus, at this stage, OpenAI has not demonstrated it is using "cameo" in a purely descriptive manner.

\* \* \*

In sum, OpenAI uses "cameo" as the app-defining feature to promote the Sora application; it uses it in a manner derived from Plaintiff's CAMEO ® mark; it is employing a nearly identical marketing strategy; and it is using "cameo" to describe realistic AI-videos that are, at times, indistinguishable from Plaintiff's authentic Cameo Videos.  Under these circumstances, OpenAI has not carried its burden of showing that its use of "cameo" is "objectively fair." *Fortune Dynamic*, 618 F.3d at 1039, 1043.  Thus, Plaintiff is likely to succeed on the merits of its trademark infringement claim.

### B.    Irreparable Harm

Having shown a likelihood of success on the merits of its trademark infringement claim, Plaintiff is "entitled to a rebuttable presumption of irreparable harm."  15 U.S.C. §1116(a); *see also AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 694 (9th Cir. 2022) (same).  But Plaintiff does not rely solely on this presumption.  Plaintiff also argues that it will suffer irreparable harm in the form of damage to its business reputation and goodwill absent an injunction.  MPI Reply at 9-10.  Specifically, Plaintiff alleges that it has "dedicated nearly a decade to ensuring its CAMEO® brand is closely connected in the consumer's mind with *authentic* celebrity-fan interactions," Compl. ¶ 53, and as a result, CAMEO® has become "a digital certificate of authenticity," Galanis TRO Reply Decl. ¶ 10.  Thus, Plaintiff argues that its mark will lose its "imprimatur of authenticity" if OpenAI is allowed to continue producing "a glut of . . . celebrity deepfake content" under the cameo mark.  MPI Reply at 9-10; *see also* Galanis TRO Reply Decl. ¶ 10 ("In the age of AI and deepfakes, the Cameo watermark is a digital certificate of authenticity.  When users come to Cameo, they know that it's real.").

Plaintiff's concern is based on troubling content already generated on the Sora application. For example, within the first few weeks of launching Sora 2, users began generating and sharing "hyper-realistic deepfake videos" of Martin Luther King, Jr. doing "crude, offensive or racist things," including videos of him stealing from a grocery store and fleeing from police. Byron TRO Decl. Ex. 15 (reporting that OpenAI "blocks MLK Jr. videos on Sora after 'disrespectful depictions'"). Consequently, Plaintiff has shown a likelihood that OpenAI's continued use of "cameo" threatens Plaintiff's "control over [its] business reputation and damage to goodwill," which is a type of irreparable harm. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (citation omitted).

### C.    Balance of Equities

OpenAI argues that the balance of equities tips in its favor. OpenAI argues that it is "likely to experience reputational harm from being labeled an 'infringer' without the benefit of full discovery and a trial." MPI Opp. at 12 (citing *CyberMedia, Inc. v. Symantec Corp.*, 19 F. Supp. 2d 1070, 1080 (N.D. Cal. 1998)). OpenAI also emphasizes that it will suffer monetary harm from the cost to rename its feature and the costs of disrupting and modifying the product launch. *See* Sahai TRO Decl. ¶¶ 26-27; Sahai MPI Decl. ¶ 12, ECF No. 47 ("The more significant harm to OpenAI than engineering and revisions costs arose from the resulting distraction and disruption to the broader product, launch, and user education effort.").

The Court finds that the balance of the equities tips in favor of Plaintiff. As an initial matter, OpenAI has not explained how these harms outweigh the harm Plaintiff is likely to suffer absent an injunction. Additionally, as explained in the TRO Order, OpenAI's harm arises from its own likely infringing use of a registered mark. TRO Order at 15; *see also Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) ("Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration on an appeal from a preliminary injunction." (citation modified)), *superseded by statute on other grounds.* In *2Die4Kourt*, the Ninth Circuit affirmed the issuance of a preliminary injunction where the defendant faced extreme hardship in the form of shutting down its business, terminating its employees, and defaulting on its

United States District Court
Northern District of California

1    obligations.  692 F. App'x at 369 ("But when the harm complained of results from a defendant's

2    allegedly infringing conduct, we have nonetheless approved the entry of a preliminary injunction."

3    (citing *Triad*, 64 F.3d at 1338)).  Here, OpenAI is not at risk of losing its business or even direct

4    sales loss as Sora 2 is free.  It must simply rename its feature, which it has already done.  *See* MPI

5    Reply at 8.  The Court accounts for this potential harm in setting the bond.

6           Finally, as to OpenAI's argument that it will experience reputational harm from being

7    "labeled an 'infringer,'" MPI Opp. at 12, this harm alone cannot tip the balance of equities in

8    OpenAI's favor because such a rule would necessarily prevent preliminary injunctive relief in

9    trademark infringement cases.  *See generally InSinkErator, LLC v. Joneca Co.*, 163 F.4th 608, 624

10   (9th Cir. 2025) (affirming grant of preliminary injunction in trademark case); *OpenAI, Inc. v. Open*

11   *A.I., Inc.*, No. 24-1963, 2024 WL 4763687, at *2-3 (9th Cir. Nov. 13, 2024) (same).  OpenAI cites

12   to *CyberMedia* in support of its argument.  There, the district court explicitly "made no

13   determination as to whether [the defendant was] an innocent or a willful infringer," and

14   nevertheless issued the preliminary injunction.  *CyberMedia*, 19 F. Supp. 2d at 1080 n.19.  Thus,

15   *CyberMedia* does not stand for the proposition that the risk of being labeled an infringer tips the

16   balance of equities in favor of the defendant.

17          In sum, the Court finds that the balance of the equities weighs in Plaintiff's favor.

18          **D.    Public Interest**

19          "An injunction that prevents consumer confusion in trademark cases . . . serves the public

20   interest."  *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 636 (9th Cir. 2013)

21   (citing *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 993 (9th Cir.

22   2009)).  OpenAI argues that the public interest factor weighs against an injunction because "the

23   public's right to use descriptive words or images in good faith in their ordinary descriptive sense

24   must prevail over the exclusivity claims of the trademark owner."  MPI Opp. at 12 (citation

25   omitted).  OpenAI has failed to carry its burden of demonstrating that it is not using "cameo" as a

26   mark, and that it is using it in its ordinary descriptive sense.  Thus, an injunction prohibiting

27   OpenAI's use of "cameo" based on the facts of this case in no way prevents *the public* from using

28   "cameo" in its ordinary descriptive sense.  The public interest also weighs in favor of a

1    preliminary injunction.

2        **E.    Rule 65(c) Bond**

3        The Court orders Plaintiff to provide a bond or security pursuant to Federal Rule of Civil

4    Procedure 65(c), but it will not set the bond at $1,000,000 as OpenAI requests.  *See* MPI Opp. at

5    12.  The affected party bears the burden of "presenting evidence that a bond is needed."  *Conn.*

6    *Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003).  "The district

7    court is afforded wide discretion in setting the amount of the bond, and the bond amount may be

8    zero if there is no evidence the party [affected by the injunction] will suffer damages from the

9    injunction."  *Id.* at 882 (first citing *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir.

10   1999); and then citing *Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000)).

11       Despite the Court raising concerns about the lack of evidence regarding the appropriate

12   amount of the bond at the TRO hearing and in the TRO Order, OpenAI has offered little to support

13   its request.  Of the $1,000,000 bond sought, OpenAI attributes approximately $10,000 to $40,000

14   to engineering costs associated with removing "cameo" from the Sora application, with the

15   remaining balance attributed to reputational harm and "disruption to the broader product, launch,

16   and user education effort."  Sahai MPI Decl. ¶¶ 11-13 ("The cost of this is very difficult for me to

17   quantify.").

18       While the preliminary injunction could pose a risk of potential harm to OpenAI beyond

19   direct engineering costs, the Court is not persuaded that a reasonable security for this harm is

20   $960,000, particularly where Sora 2 is offered free of charge and OpenAI admittedly does not

21   maintain a marketing budget for the product.  Sahai TRO Decl. ¶ 25; *see also CyberMedia*, 19 F.

22   Supp. 2d at 1080 (accounting primarily for quantifiable lost sales in its bond determination, but

23   imposing an additional $100,000 security for out-of-pocket promotional expenses, reputational

24   harm, and other expenses associated with recalling products).  Given the lack of guidance from

25   OpenAI, the Court sets the bond at $100,000, taking into account the direct engineering costs, the

26   reputational harm, and other expenses associated with the possible disruption to the product

27   launch.  *See InSinkErator*, 163 F.4th at 623 (noting the district court's discretion in setting the

28   security bond).

**IV.     CONCLUSION**

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is GRANTED.

**IT IS SO ORDERED.**

Dated:  February 14, 2026

_____
Eumi K. Lee
United States District Judge

**APPENDIX**

**Figure 1:  Berwick Comparison (Raphael TRO Reply Decl. ¶ 14)**

 

| Sora-generated video featuring "Cameo" of Ricky Berwick (Exhibit 4) | Actual CAMEO video featuring Ricky Berwick (Exhibit 5) |
| --- | --- |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**Figure 2:  App Eveready Stimulus (O'Laughlin Report ¶ 51)**



<u>Note:</u>
[1] The red rectangles were not shown to respondents in the survey stimulus. They are displayed in this figure only to highlight the terms "cameo" and "spotlight."

1

**Figure 3: Webpage Eveready Stimulus (O'Laughlin Report ¶¶ 16-17)**

2

3



4

5

6

7

8

9

10

11

12

13

14



15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Figure 4:  Franklyn Eveready Stimulus (Franklyn Report at 21)**